FILED
10/22/2020
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 1, 2020

IN RE BRANTLEY O.

**Appeal from the Juvenile Court for Franklin County**
**No. 2017-JV-52    Thomas C. Faris, Judge**

_____

**No. M2019-01265-COA-R3-PT**

_____

A mother appeals the termination of her parental rights to her child. The juvenile court determined that there were three statutory grounds for terminating the mother's parental rights: abandonment by an incarcerated parent, substantial noncompliance with the permanency plan, and failure to manifest an ability and willingness to assume custody and financial responsibility. The juvenile court also determined that termination of the mother's parental rights was in her child's best interest. Because the record contains clear and convincing evidence to support both the grounds for termination and the best interest determination, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON II, J., joined.

Glen A. Isbell, Winchester, Tennessee, for the appellant, Caryn G.

Herbert H. Slatery III, Attorney General and Reporter, and Matt D. Cloutier, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

**A.**

On June 3, 2015, a juvenile court placed almost two-year-old Brantley in the temporary custody of his great-grandparents, Harry and Eunice M. ("Great-

Grandparents"), his mother's grandparents. The court later found the child dependent and neglected after his mother, Caryn G. ("Mother"), having already pled guilty to criminal neglect of Brantley, waived the adjudicatory hearing. Brantley's father, whose whereabouts were unknown, was not a part of the child's life.

Although permitting Great-Grandparents to retain temporary custody, the court placed restrictions on them, including who could live in their home. The court granted visitation to Mother supervised by Great-Grandparents. Mother was also ordered to attend and complete parenting classes and to complete alcohol and drug treatment.

In September 2015, the court allowed Mother to move in with Great-Grandparents and to have unsupervised visitation with her child. But Mother could not take the child away from Great-Grandparents' home overnight.

On January 13, 2016, Brantley's guardian ad litem (the "GAL") moved to change custody and to restrict or suspend Mother's visitation. The court found that Great-Grandparents had permitted a person into their home in contravention of its previous order and that one of the Great-Grandparents had misled a court appointed special advocate ("CASA") volunteer regarding Mother's whereabouts. The court also expressed concern regarding Great-Grandparents' ability to care for a two-year-old child given their physical limitations. Both Great-Grandparents were at times confined to wheelchairs.

As for Mother, she had been "kicked out" of the Great-Grandparents' home for yelling and cussing at them. But that did not keep her from seeing her child. Despite the court's prior order, Mother admitted to removing Brantley from Great-Grandparents' home overnight. And Mother failed to complete her alcohol and drug treatment or parenting classes.

On the GAL's motion, the court awarded custody to the Tennessee Department of Children's Services ("DCS"), and Brantley was placed in a foster home. In February, DCS, with Mother's input, developed a family permanency plan with the goal of returning Brantley either to Mother or to a relative.

Mother started off slowly in meeting the requirements of the permanency plan. But by November 2016, both the DCS case worker and the GAL recommended a trial home placement, which took place in January 2017. The placement ended abruptly that same month when Mother tested positive for methamphetamine, cocaine, and benzodiazepine. The court ordered Mother to have no contact with the child.

After the failed trial home placement, in March 2017, a second permanency plan was developed. But Mother's positive drug test violated the terms of her probation

resulting from her guilty plea to child neglect. So she started serving her sentence on March 16, 2017.

B.

On May 31, 2017, while Mother was still jailed, DCS petitioned to terminate her parental rights.[1] As grounds, the petition alleged abandonment by an incarcerated parent, substantial noncompliance with the permanency plan, and failure to manifest an ability and willingness to assume custody or financial responsibility.

Later in the year, Mother was furloughed from jail so that she could attend a 14 to 16 month inpatient treatment program (the "Treatment Program"). Mother's stay in the Treatment Program delayed the trial of the termination case. When the trial finally did occur in May 2019, a representative of the Treatment Program, the DCS case worker, Mother, the child's foster mother, and the CASA volunteer testified.

The representative from the Treatment Program testified that Mother began the program on September 5, 2017. Mother initially showed progress and had some breakthroughs in counseling. The representative described Mother as "thriving" during the first few months of the program. But then Mother's old behaviors kept coming back up. After leaving for a day on a day pass, Mother returned and tested positive for nicotine. The Treatment Program prohibited smoking. Later, Mother was caught trading her prescribed medication with another resident. As a result of this violation, Mother was punished but allowed to stay in the program. When Mother was caught trading her medication again, she was discharged.

The DCS case worker testified that Mother's number one issue was drugs. In 2016, with the support of Brantley's great-grandfather, Mother was attending alcohol and drug counseling and going to parenting classes as recommended by DCS. She worked on her mental health. She also passed random drug screens. By June 2016, Mother was doing so well that she was granted unsupervised weekend visitation even though Mother did not have a place to live. In August 2016, Mother's only remaining issue under the first permanency plan was housing.

Mother's progress resulted in the January 2017 trial home placement. But the placement ended less than three weeks later with Mother's positive drug test. The positive drug test led to jail and then a furlough to seek treatment.

---

[1] DCS also petitioned to terminate the parental rights of a man who appeared on Brantley's birth certificate and acknowledged paternity, as well as another man who claimed he was the biological father. The court terminated the parental rights of the man who acknowledged paternity, and he did not appeal. The man who claimed he was the biological father was dismissed from the case after genetic testing.

3

Following her discharge from the Treatment Program, Mother agreed that she would come to the DCS office once a week for drug testing. According to the case worker, Mother never refused to take a drug test, but she often said she could not meet him for a drug test because of other plans. She tested positive for benzodiazepine once. Although she claimed she had a prescription, she failed to produce it.

The case worker claimed that he had not seen any efforts by Mother to help herself since leaving the Treatment Program. According to him, "we're right back to where we started when [the child came] into custody. I mean, she's still with grandma. She hasn't completed the – an A&D program, like, [the Treatment Program]. She doesn't have housing. She still doesn't have employment."

At the time of trial, Mother lived with her grandmother, who, along with her husband, had filed the petition for emergency custody of Brantley. Her grandmother required 24-hour care and could not do anything by herself. Mother received $400 a month from grandmother for assisting with her needs. But otherwise, Mother did not work.

Mother blamed the failure of the trial home placement in January 2017 on the death of her grandfather. According to Mother, when he died on November 1, 2016, "the wheels fell off." She described him as her anchor.

As for her discharge from the Treatment Program, Mother disputed the first instance of trading her prescription medication. She called the allegation "hearsay" by another Treatment Program resident. Mother conceded that she gave her medication to another resident on another occasion.

Mother acknowledged agreeing to once-a-week drug testing after her discharge from the Treatment Program. When asked why she did not do so, Mother explained that she did not have transportation and that she had to take care of her grandmother. Mother did not have a driver's license because she had been convicted of being a habitual motor vehicle offender.

Mother also acknowledged an extensive arrest record dating back to 2006. That year she was convicted of domestic assault. *See* Tenn. Code Ann. § 39-13-111 (2018). In 2010 and 2012, she was convicted of driving on a revoked license, Tenn. Code Ann. § 55-50-504 (2017); simple possession of a schedule IV drug, Tenn. Code Ann. § 39-17-418 (2018); theft under $500, Tenn. Code Ann. § 39-14-144 (2018); and domestic assault, Tenn. Code Ann. § 39-13-111. In February 2013, while Mother was pregnant with Brantley, she was arrested and later convicted of casual exchange of a controlled substance. *See* Tenn. Code Ann. § 39-17-418. In October 2013, shortly after Brantley's birth, she was arrested for simple possession of a schedule IV drug. *See id.* And in May

4

2015, Mother pled guilty to child neglect as a result of the incident that led to the child's removal. *See* Tenn. Code Ann. § 39-15-401 (Supp. 2019).

Even after the child was taken into DCS custody, Mother's legal troubles continued. In addition to violating the terms of her probation by testing positive for drugs in the midst of the trial home placement, Mother was also convicted of domestic assault and making a false report to a law enforcement officer. *See* Tenn. Code Ann. §§ 39-13-111, 39-16-502(a)(1)(A) (2018). In the week before the trial, Mother was arrested for driving on a revoked license. *See* Tenn. Code Ann. § 55-50-504.

Brantley's foster parents attended the trial, but only the foster mother testified. Brantley had been with the family since January 2016 when he was a little over two years old. The family consisted of the foster mother, the foster father, their son, and Brantley. According to the foster mother, Brantley adjusted well to the foster home and did not have any present difficulties. She noted that, after the trial home placement, Brantley dug in the trash for food, which was a new behavior. Since Mother had left the Treatment Program, the child had started counseling. At first, the counseling was weekly, but now Brantley went to counseling once a month. The foster family wanted to adopt Brantley if possible.

The CASA volunteer had been involved since Great-Grandparents filed their petition for emergency temporary custody. She was concerned for Brantley's safety during the original placement with Great-Grandparents. When she attempted to visit Mother at her grandmother's home in January before the trial, Mother was not at home. The grandmother claimed that Mother and the child would not be living with her and refused to let the CASA volunteer inspect the house. The CASA volunteer had visited the foster home. When asked about the foster home, the CASA volunteer described Brantley as being "a very happy little boy."

At the conclusion of the trial, the juvenile court terminated the parental rights of Mother. The court concluded that the evidence was clear and convincing as to all three grounds alleged for terminating Mother's parental rights. The court also concluded that the evidence was clear and convincing that termination of Mother's parental rights was in the child's best interest.

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those circumstances in which the State's interest in

5

the welfare of a child justifies interference with a parent's constitutional rights. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2019).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1) (2017). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

## A.

Mother argues that the evidence does not clearly and convincingly support the statutory grounds relied on by the juvenile court for terminating her parental rights. Mother also argues that the evidence does not clearly and convincingly support the finding that termination of her parental rights was in the child's best interest.

1. Substantial Noncompliance

The juvenile court found Mother was not in substantial compliance with the requirements of the permanency plan. *See* Tenn. Code Ann. § 36-1-113(g)(2) (2017). Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements that the parent allegedly failed to satisfy were "reasonable and are related to remedying the conditions that necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C) (2014). Permanency plan requirements may focus on remedying "conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547.

We agree with the juvenile court that the permanency plan requirements were reasonable and related to remedying the conditions that necessitated foster care. The child entered foster care due to Mother's drug abuse and her neglect of the child. To address these issues, the permanency plan required Mother to complete an alcohol and drug assessment; submit to random drug screens; notify physicians of alcohol and drug issues to reduce access to prescription drugs; complete a parenting course; maintain safe and stable housing free from drugs, alcohol, and domestic violence; maintain employment; and make sure anyone living in the house or frequently visiting will submit to a drug screen.

Next, we must determine whether Mother's noncompliance was substantial in light of the importance of the requirements to the overall plan. *See id.* at 548-49. "Substantial noncompliance is a question of law which we review de novo with no presumption of correctness." *Id.* at 548. A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). We review the court's findings of fact concerning compliance with the requirements of the permanency plan de novo with a presumption of correctness. *See In re Valentine*, 79 S.W.3d at 547.

We conclude that the evidence is clear and convincing that Mother failed to substantially comply with the requirements of the permanency plans. After the first few months, Mother began to work on her permanency plan. She was attending alcohol and drug counseling and going to parenting classes. And she was passing drug screens. But during the trial home placement, Mother tested positive for methamphetamine, cocaine, and benzodiazepine. Her probation was revoked, and she went to jail. She was able to obtain a place at the Treatment Program to address her substance abuse problem, but she was discharged for failure to follow the rules. Since her discharge, Mother had only submitted to one drug screen for DCS, and she had not completed a drug rehabilitation program. She also did not have a home of her own, and her only source of income was

7

an informal arrangement with her grandmother. Although they were separated and Mother claimed she intended to divorce him, Mother's husband was a registered sex offender who was considered a danger to children.

2. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility for the Child

The court found termination of parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14) (2017). Under this ground, a parent's rights may be terminated if he or she

> [1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *See In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019).

We conclude that terminating Mother's parental rights on the ground of failure to manifest an ability and willingness to assume legal and physical custody was appropriate. DCS established the first prong by showing by clear and convincing evidence that Mother failed to manifest either an ability or willingness to personally assume legal and physical custody or financial responsibility of her child.[2] Mother was unemployed for much of the time the child was in custody. And after testing positive for drugs during the trial home placement, Mother spent seven months in jail, then seven months in the Treatment Program, and then moved in with her grandmother. Although her grandmother required 24/7 care, it was Mother's grandmother who was covering all housing expenses while also paying Mother $400 per month. Despite multiple chances and multiple services offered to Mother, she remained unable to care for or support her child.

---

[2] This Court is split over the proper interpretation of the first prong of Tennessee Code Annotated § 36-1-113(g)(14). *See In re Ellie K.*, No. M2019-01269-COA-R3-PT, 2020 WL 1943522, at *9-11 (Tenn. Ct. App. Apr. 23, 2020) (describing the Court's differing views on the first prong). The split concerns whether a parent must fail to manifest both an ability and willingness to assume custody or financial responsibility or whether a parent must fail to manifest either an ability or willingness to assume custody or financial responsibility. *Compare In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), *with In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018). Here, under either view, DCS met its burden of proof.

The evidence is equally clear and convincing that returning the child to Mother's custody would pose a risk of substantial harm to his physical or psychological welfare. At the time of trial, Mother was married to a registered sex offender, and although separated, Mother's current living circumstances could not be verified given her grandmother's refusal to allow the CASA volunteer to see the home. Brantley had been removed from this same grandmother in January 2016. And Mother tested positive for methamphetamine, cocaine, and benzodiazepine during the trial home placement. She had not completed a treatment program since.

### 3. Abandonment by an Incarcerated Parent

The General Assembly has provided "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 36-1-102(1)(A) (2017) (defining the term "abandonment"). The fourth definition of "abandonment" applies in cases in which the parent is incarcerated or had been incarcerated within the four-month period preceding the filing of the petition to terminate and "contains two distinct tests for abandonment." *In re Audrey S.*, 182 S.W.3d at 865. One test examines pre-incarceration visitation and support, and the other examines the pre-incarceration conduct of the parent. The incarcerated or formerly incarcerated parent is deemed to have abandoned a child if he or she:

> either . . . has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration, or the parent . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv).[3] The juvenile court found that DCS had proven by clear and convincing evidence that Mother had abandoned her child under the wanton disregard test.

"Wanton disregard" is not a defined term. "[A]ctions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in

---

[3] Although not relevant to the second prong which is relied on in this case, the first prong of this ground was amended as of July 1, 2018, so that petitioners no longer have to prove a parent's failure to support or to visit was willful. Tenn. Code Ann. § 36-1-102(1)(I) (Supp. 2019).

combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68.

The juvenile court referenced Mother's behavior both prior to and after her incarceration to support the finding of this factor. But this ground is restricted to conduct before incarceration. *In re Johnathan M.*, 591 S.W.3d 546, 556 (Tenn. Ct. App. 2019). So only Mother's conduct before March 16, 2017, should be considered.

Clear and convincing evidence supports the juvenile court's finding that Mother's pre-incarceration conduct exhibited wanton disregard for her child's welfare. Mother's criminal history was extensive prior to her incarceration in March 2017. She was convicted of casual exchange, simple possession, child neglect, and domestic assault. Mother was charged and later convicted with a drug offense while she was pregnant with the child and another drug offense within one month of his birth. Mother's substance abuse caused the initial removal of the child from her custody. And when she was given the opportunity for a trial home placement, Mother squandered that opportunity by using drugs. Her positive drug test led to her probation violation and subsequent incarceration. Substance abuse led directly to both the removal of the child and her incarceration. As the DCS case worker testified, substance abuse was Mother's number one issue.

The proof further showed that Mother failed to provide adequate support or supervision for the child. Mother pled guilty to child neglect in connection with the incident that led to removal of Brantley and his placement with Great-Grandparents.

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests. Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts must consider in making a best interest analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682. The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the

10

parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

After considering all the statutory factors, the juvenile court determined that termination of parental rights was in the child's best interest. The first two statutory factors look at the parent's current lifestyle and living conditions. The first factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1) (2017). The second factor considers the potential for lasting change. *See id.* § 36-1-113(i)(2) (asking "[w]hether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible"). The juvenile court found that Mother failed to make changes in her conduct or circumstances and that lasting change did not appear possible.

The evidence supports the findings made relative to factors one and two. Mother has continued to struggle with her substance abuse issue. She was living, once again, with her grandmother who was supporting her. And the case worker testified that Mother was back to where she was at the beginning of DCS involvement and had not made a lasting change.

The third and fourth factors focus on the parent's relationship with the child. The third factor focuses on the consistency of visitation. *See id.* § 36-1-113(i)(3). The fourth factor considers "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-1-113(i)(4). The court found that consistency of visitation was in Mother's favor. And the court found that there was evidence both ways concerning the existence of a meaningful relationship between the child and Mother.

The fifth factor evaluates the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). The court found that it would be devastating to move the child from his foster home. At the time of trial, the child had lived with the same foster family for three years and four months, with the exception of a little over two weeks when the child was with Mother during the trial home placement. Brantley had bonded with the family, who had provided the only safe and stable home he had ever known. And the foster family would like to adopt the child.

Under the sixth factor, the court determines whether the parent or another person residing with the parent "has shown brutality, physical, sexual, emotional or

11

psychological abuse, or neglect toward the child" or another person in the home. *Id.* § 36-1-113(i)(6). The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). The court found that Mother had neglected the child and that there was no indication of stability in Mother's home environment.

The eighth statutory factor evaluates the parent's mental and emotional health, asking "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child." *Id.* § 36-1-113(i)(8). The court also determined that this factor favored termination.

The ninth factor considers the parent's child support history. *See id.* § 36-1-113(i)(9). The court did not apply this factor because Mother was not ordered to pay child support nor did she have the means to pay support.

In sum, we agree with the juvenile court's best interest determination. The combined weight of the proven facts amounts to clear and convincing evidence that termination of Mother's parental rights is in the child's best interest.

## III.

The record contains clear and convincing evidence to support terminating Mother's parental rights on the three grounds presented. The record also contains clear and convincing evidence that termination is in the child's best interest. So we affirm the termination of Mother's parental rights.

_____
W. NEAL MCBRAYER, JUDGE

12